[Crim. No. 8693. · Second Dist., Div. Three. July 29, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. JESSIE C. TIDMORE, Defendant and Appellant.

Erling J. Hovden, Public Defender, Edward B. Olsen and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Lawrence R. Tapper and Gilbert Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

FORD, J.—The defendant was charged with the crime of burglary. (Pen. Code, § 459.) It was alleged that he entered the residence of Mr. and Mrs. James Hughes with the intent to commit rape. The defendant waived his right to trial by jury. It was stipulated that the cause could be submitted on the transcript of the testimony taken at the preliminary examination, together with such further evidence as either party desired to offer. Further testimony was received. The defendant was found to be guilty of burglary of the first degree. His motion for a new trial was denied. The proceedings were suspended without the imposition of sentence and the defendant was placed on probation for a period of three years, a condition thereof being that he spend the first 90 days in the county jail. The public defender, who represented the defendant at the trial, has undertaken to represent him on this appeal. The appeal is from the judgment (order granting probation).[1]

Since the defendant's contention is that there was no substantial evidence that he entered the residence with the intent to commit rape, it is necessary to set forth a résumé of

---

[1]There is also an attempted appeal from the order denying the motion for a new trial. Such an order is not appealable. (Pen. Code, § 1237.)

.the testimony. Mrs. Hughes testified that she knew the defendant. He had been at the Hughes' residence when she and her husband were present. On May 20, 1962, she was asleep in bed. Her husband was not at home. At approximately 3 o'clock in the morning she heard a noise; a dresser in the bedroom was being moved. She turned on the light and saw the defendant's face. He had put his head and one of his hands into the room through a window which had been opened, and he was pushing a dresser away from the window. He did not say anything but just looked at her. Mrs. Hughes screamed and went into the kitchen where she obtained a knife. When she returned to the bedroom the defendant was gone. She had no telephone. Her husband, James Hughes, came home about 4 a.m. She then went to a friend's residence and called the police. She further testified that she did not give the defendant permission to enter her bedroom.

James Hughes testified that he went to the defendant's place of residence with the officers who responded to the call. The defendant was in bed.

Officer Kilroy testified that he accompanied Mr. Hughes to the defendant's residence. The hood and the tail pipes of the defendant's automobile were warm. Upon inquiry, the defendant said that he had arrived home at approximately 2 o'clock and that he had not been at the Hughes' house that night. Before the officers mentioned the time of the incident at the Hughes residence, he said, "It could not have been me because I was home prior to 2:00 o'clock."

Officer Leslie testified that he talked to the defendant at the police headquarters. After he had been told that his fingerprints had been found on the window frame, the defendant said his prior denial that he had been near the Hughes residence was false and that he wished to tell the truth. He then said he had been engaging in an "extramarital affair" with Mrs. Hughes for several months and that she had told him to come to her house and tap on her window after her husband had gone to work. He said he went there but received no response. He raised the window about 6 inches and tapped on it again. When he identified himself, Mrs. Hughes said: "Get away from here. I am going to call the police and going to tell my husband." He left and went home.

At a later time, the defendant told Officer Leslie that he

had lied; Mrs. Hughes had not invited him to her residence. The officer further testified: "He stated that on Saturday night he got an idea to go over to her house and that is how he happened to be there and knock on her bedroom window. He continued to maintain, however, that he had a long-standing relationship with Mrs. Hughes." When Mrs. Hughes was brought to the police headquarters and, in the defendant's presence, denied that there had been the asserted relationship, the defendant said that he had lied and now wished to tell the truth. Part of his statement at that time, as related by Officer Leslie, was: ". . . at this time he said he had never had any sort of relationship with the victim, Mrs. Hughes, but that he had admired her over a period of time and thought she was a good-looking woman, and he stated he had in fact gone to her residence, knocked on her bedroom window, and that his intention was to gain entry and persuade her to have intercourse with him." The officer further said that the defendant "continued to maintain he made no attempt to enter."

At the trial the defendant testified in his own behalf. He was 37 years old and worked as a porter at a used-car lot. He had known Mrs. Hughes for "a couple of years" and Mr. Hughes since 1953. He went to their home "every night" and had been through the entire house. Mr. Hughes asked him to take Mrs. Hughes to and from night school, and he did that on some occasions. He and Mrs. Hughes were "just friends" and he never attempted to "make love to her." Mr. Hughes borrowed three dollars from him about two months before the window incident. On May 17, 1962, Mr. Hughes said that he would repay him in the afternoon, but he did not do so. His efforts over the next few days to collect the money were unsuccessful. About 2:30 o'clock on the morning of May 20, he knocked on the door of the Hughes' residence but no one answered. He went to the window and asked Mrs. Hughes if Mr. Hughes was there. She answered that he was not. While he was standing at the window talking to her, she jumped up, screamed at him, and ran into the kitchen. He left. He had pushed the dresser about 3 or 4 inches and he could then see into the room. The lights were on while they were talking. He did not attempt to enter through the window and did not intend to go into the house. He did not raise the window; it was partially open. He did not put his head inside the opening. His purpose in going there was to get his three dollars. He

had no intention of raping Mrs. Hughes. He did not know that Mr. Hughes was working that night.

Officers Free and Kilroy, the arresting officers, testified in rebuttal that the defendant never told them that he had gone to the Hughes home to collect a debt from Mr. Hughes. Similar testimony was given by Officer Leslie. Mr. Hughes testified that he did not owe any money to the defendant on May 20.

The question to be resolved on this appeal is whether there was substantial evidence to support the conclusion of the trier of fact that the defendant acted with the requisite specific intent. (See *People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911].) ▇ That element of the offense consists of an intent to have sexual intercourse with the victim and to use force to overcome her resistance. (*People* v. *Nye,* 38 Cal.2d 34, 37 [237 P.2d 1]; *People* v. *Meichtry,* 37 Cal.2d 385, 388-389 [231 P.2d 847].) ▇ Such specific intent, like any other essential fact, must be proved by evidence or inferences reasonably deducible therefrom. (See *People* v. *Snyder,* 15 Cal.2d 706, 708 [104 P.2d 639].) "It is not enough to prove merely a purpose to have intercourse." (1 Witkin, California Crimes, § 262, p. 247; see *Roberts* v. *State,* 136 Tex. Cr. Rep. 138 [124 S.W.2d 128, 129].)

▇ An analysis of the evidence in the light most favorable to the People compels the conclusion that nothing more was shown as to the defendant's intent than that he desired to have sexual intercourse with Mrs. Hughes. While his conduct was reprehensible, there was no proof that he intended to accomplish his purpose by use of force rather than by persuasion. Apropos are the words of this court in *People* v. *Blackwell,* 193 Cal.App.2d 420 [14 Cal.Rptr. 224], at page 425: "That the circumstances were suspicious may be conceded, but mere surmise and conjecture are not enough." Since the evidence falls short of the quantum necessary to overcome the presumption of innocence and to meet the burden resting on the prosecution to establish guilt beyond a reasonable doubt, the conviction cannot stand. (See *Roberts* v. *State, supra,* 136 Tex.Cr.Rep. 138 [124 S.W.2d 128]; *Hooks* v. *State,* 154 Tenn. 43 [289 S.W. 529]; *State* v. *Brown* (Mo.) 217 S.W.2d 546; *Dixon* v. *Commonwealth,* 197 Va. 380 [89 S.E.2d 344].)

The attempted appeal from the order denying the motion for a new trial is dismissed. The judgment (order granting probation) is reversed.

Shinn, P. J., and Files, J., concurred.

A petition for a rehearing was denied August 13, 1963, and respondent's petition for a hearing by the Supreme Court was denied September 18, 1963. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.